UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


RYAN SHEEHAN,                    *    Case No. 19-CV-4154 (DLI)
                                *
              Plaintiff,         *    Brooklyn, New York
                                *    July 14, 2021
       v.                       *
                                *
CONSENSYS, INC.,                *
                                *
              Defendant.         *
                                *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

          TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
             BEFORE THE HONORABLE TARYN A. MERKL
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          JORDAN A. El-HAG, ESQ.
                            El-Hag and Associates PC
                            777 Westchester Avenue, Suite 101
                            West Harrison, NY 10604


For the Defendant:          SCOTT M. COOPER, ESQ.
                            Davis Wright Tremaine LLP
                            1251 Avenue of the Americas, 21st Fl
                            New York, NY 10020




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1           (Proceedings commenced at 3:04 p.m.)

2           THE CLERK:  This is civil cause for a status

3    conference, Docket 19-CV-4154, Sheehan vs. Consensys, Inc.

4    Before asking the parties to state their appearance, I would

5    like to note the following.

6           Persons granted remote access to proceedings are

7    reminded of the general prohibition against photographing,

8    recording and re-broadcasting of court proceedings.

9           Violation of those prohibitions may result in

10   sanctions, including removal of court-issued media

11   credentials, restricted entry to future hearings, denial of

12   entry to future hearings or any other sanctions deemed

13   necessary by the Court.

14          Will the parties please state their appearances for

15   the record, starting with the plaintiff?

16          MR. EL-HAG:  Jordan El-Hag on behalf of plaintiff.

17   Good afternoon, Your Honor.

18          THE COURT:  Good afternoon.

19          MR. COOPER:  Good afternoon, Your Honor.  This is

20   Scott Cooper of Davis Wright Tremaine on behalf of Defendant

21   Consensys.

22          THE COURT:  Good afternoon.  So we're here today,

23   obviously new to this case which has been pending for a while.

24   I'm trying to get a sense of what's going on.

25          Obviously, we have reviewed the documents on the

1       docket, including the most recent letters indicating that the

2       plaintiff is still suffering following his medical crisis of

3       2020.

4              So I'd like to start with you, Mr. El-Hag, to get a

5       sense of where things stand with regard to the plaintiff and

6       what you think we need to do with this case.

7              MR. EL-HAG:  Thank you, Your Honor.

8              To be honest, this is really the first time I've

9       ever had to deal with something like this, so I'm just kind of

10      going with the -- I don't want to say the flow, but as things

11      develop, I'm just trying to advocate the best I can on behalf

12      of my client.

13             You know, the family would like to try to resolve

14      this case and focus on Mr. Sheehan's health and recovery if at

15      all possible.

16             I think they're very flexible and willing to do so

17      at what they would consider a nominal settlement amount.

18      Obviously, Mr. Sheehan has more significant issues he has to

19      deal with in his life at this point.

20             At the same time, you know, his parents -- his

21      mother has power of attorney, doesn't want to just, you know,

22      give up on the lawsuit if at all possible.  I don't think --

23      not that I don't think.

24             Mr. Sheehan really can't participate fully in

25      litigation at this point.  He does need more time to heal.

4

1          He is capable of making decisions concerning the

2     direction of the case with the assistance of his mother as

3     power of attorney.

4          However, he really, you know, because of his medical

5     crisis, lost his ability to see.  And so he really can't read

6     documents.  He's still learning how to walk again.  And this

7     is just this slow progression of healing.

8          And I don't think there's a medical consensus as to,

9     you know, hey, this is the best it's going to be for him or if

10    more time is needed and, you know, what is expected.  Like

11    nobody really knows.  They don't know what caused this to him.

12    So I'm kind of flying in the dark.

13         And I think the preference for the family would be

14    to just settle this for, you know, a number they feel is

15    reasonable and fair.

16         And if that's not possible, they'd like to just

17    afford their son the opportunity to heal until it's determined

18    that he either can't participate any longer or he can, and he

19    can litigate the claims.

20         THE COURT:  So is it fair to say that the prognosis

21    is unclear?

22         MR. EL-HAG:  Yes, Your Honor.

23         THE COURT:  And the timing is also very unclear?

24         MR. EL-HAG:  Yes.  And to be honest, I would -- I --

25    it's -- you know, I haven't had -- because of COVID and

1    everything, it's been a little difficult to -- you know, I

2    can't get access to the doctors so easily.  I don't have a

3    detailed medical report.

4           And if the Court would want something like that,

5    I -- I'd have to get in touch with his doctors and try to get

6    something more detailed.  But all my communications with the

7    families, they just -- they don't know how things are going to

8    develop.

9           THE COURT:  Right.  All right.

10          So turning to you, Mr. Cooper.  What are your

11   thoughts on what Mr. El-Hag just shared with regard to the

12   family's interest in trying to resolve this matter to permit

13   Mr. Sheehan an opportunity to sort of focus on his health and

14   recovery?

15          And, you know, I understand that discovery may have

16   been interrupted in this case, but I'd like to hear your

17   thoughts on the potential for settlement discussions to resume

18   or what you think we need to do with regard to this case.

19   Mr. Cooper?

20          MR. COOPER:  Well, Your Honor, with regard to

21   settlement, I mean, this -- Mr. Sheehan's claims were

22   frivolous from the outset, and they remain frivolous now.  My

23   client's not -- they're not willing to pay to settle.

24          We can entertain discussions about a walkaway in

25   which we would agree -- excuse me, we would agree -- in

6

1       exchange for Mr. Sheehan voluntarily dismissing his claims

2       with prejudice, we would agree to not pursue our costs and

3       fees following our motion for summary judgment.

4              But other than, there's no appetite at this time to

5       pay any money to settle, especially given the fact that

6       Mr. Sheehan, according to Mr. El-Hag, is in no position to

7       litigate.

8              And there's absolutely no information or suggestion

9       coming from the other side of the V, so to speak, as to when

10      Mr. Sheehan, if ever, will be able to resume prosecuting his

11      own claims.

12             The second part of your question, Your Honor, as to,

13      okay, well, you know, let's picture a world where, eventually,

14      hopefully in the near future, Mr. Sheehan is able and

15      available to prosecute his claims through discovery, what

16      would need to happen to get us back on track, in short, Your

17      Honor, we would need, I would imagine, you know, no fewer than

18      several executed HIPAA authorizations.

19             We need, at this point, Your Honor, a year's worth

20      of medical records from his third-party healthcare providers.

21             You know, to catch you up to speed, Your Honor,

22      absolutely nothing has happened with regard to discovery in

23      the past year that Mr. Sheehan claims to have been

24      incapacitated.

25             And, you know, judging from Mr. El-Hag's

1   representations, I would imagine that between a coma and

2   cardiac arrest and recovery, this is -- there are probably

3   thousands of pages of medical records and files and charts to

4   which we would be entitled and would have to review and would

5   have to, you know, incorporate into a larger or greater

6   deposition outline and eventually -- to eventually be prepared

7   to take Mr. Sheehan's deposition.

8           In addition to Mr. Sheehan's eventual deposition, if

9   he decides to prosecute this case, we might also need to take

10  the deposition of his one-time mental health therapist, Dr.

11  Susan Jocelyn.

12          Other than that, you know, the -- from where we sit

13  right now on the 14th of July 2021, those are the big hurdles

14  once -- or if this case gets back on track.

15          THE COURT:  Can I please ask why you think the

16  current medical records would be discoverable or relevant to

17  his claims that were filed in July of 2019?

18          MR. COOPER:  Well, Your Honor, Mr. Sheehan is

19  claiming damages for significant -- severe emotional distress.

20  So it -- if what Mr. El-Hag has been telling us for the last

21  year or so is true in that Mr. Sheehan has been going through

22  this ordeal, and he's remained either blind or, you know,

23  significantly impaired with regard to his vision and any

24  number of functions, it would follow, I think, that his

25  medical condition and anything and everything related to it

8

1    would have some impact on his mental or emotional state such

2    that it would trump any sort of distress that he might

3    otherwise be feeling from losing his job with Consensys back

4    in April of 2018.

5           THE COURT:  Mr. El-Hag, do you have thoughts on my

6    question that I first posed to Mr. Cooper, which is the

7    potential relevance of the current medical situation and the

8    records related to his medical emergency and how, if at all,

9    they relate to a fair ascertainment of the issues that were

10   filed in this case preceding that incident?

11          MR. EL-HAG:  Mr. Cooper is technically correct.  I

12   think that when an -- when a plaintiff is claiming emotional

13   distress damages, nearly all the medical records are fair

14   game.

15          I don't believe that we would be seeking emotional

16   distress damages based on the suffering that Mr. Sheehan has

17   incurred, you know, post this medical crisis.  So I don't know

18   how relevant those would be.

19          I think that prior to, you know, the medical crisis,

20   anything is fair game.  But there would just be no way that we

21   would be able to reasonably argue that, you know, he would

22   be -- you know, any of this pain and suffering after his

23   healthcare issue that he's current dealing with was caused by

24   the defendants.

25          So I don't really they're relevant, because we

1    wouldn't be arguing that the emotional distress was caused

2    after his issue.  But I would leave that to the Court.  And I

3    don't know what Mr. Cooper's response would be to my position.

4            THE COURT:  I mean, that's really what I'm getting

5    at.  When you have a major intervening incident like this, you

6    know, the question, I guess, then is the scope of the claim

7    damages and whether or not there's any attribution of his

8    current situation to the actions that he complains about with

9    regard to his loss of employment in this case.

10           So, Mr. Cooper, do you have any further thoughts on

11   this matter?

12           MR. COOPER:  Well, Your Honor, I mean, I do not want

13   to put words in Mr. El-Hag's mouth.  And certainly, if my

14   interpretation of what he just said is incorrect then, you

15   know, I'm happy to be corrected.

16           But it sounds as though Mr. El-Hag -- and perhaps he

17   might need to speak with his client or his client's family

18   before committing to this, but if what Mr. El-Hag is proposing

19   is some sort of stipulation that, you know, as of this point,

20   Mr. Sheehan is no longer pursuing emotional distress damages,

21   then certainly that's something that we could entertain.

22           And I think as a follow-up on top of that, if the

23   parties were to engage in some sort of stipulation to that

24   effect that -- then, yes, to your point, Your Honor, I don't

25   think we would need to go down that road to -- certainly not

1    to the extent that I had articulated a few moments ago about

2    obtaining the last year's worth of medical records if, of

3    course, Mr. Sheehan is not pursuing emotional distress.

4           THE COURT:  I don't think he said that.  I think --

5    I don't think he said he wasn't pursuing emotional distress

6    damages at all.

7           I think he said that there was emotional distress

8    that occurred prior to this medical crisis that he suffered in

9    May of 2020 and that any and all medical records relating to

10   Mr. Sheehan's care and treatment in advance of this crisis

11   could be discoverable but that he was not in any way saying

12   that the emotional distress he's currently suffering under, in

13   light of his changed situation, is attributable.

14          Is that -- Mr. Hag, am I -- Mr. El-Hag, am I getting

15   your position a little bit more accurately?

16          MR. EL-HAG:  You are, Your Honor.  And I would even,

17   to my client's detriment, expand upon that.  Even a back-pay

18   award would be, at this point, you know, cut off, because my

19   client is just unable to work at this point from the medical

20   crisis.  So I think largely the damages were for the most part

21   cut off like once this medical issue has -- took place.

22          THE COURT:  Well, that's a very fair --

23          MR. EL-HAG:  Because he -- he --

24          THE COURT:  -- assessment.

25          MR. EL-HAG:  Yeah.  He's unable to -- yeah.  He's

11

1    unable to work.  So he can't -- he's not entitled to back pay

2    under the law, so --

3            THE COURT:  So in light of this additional context,

4    Mr. Cooper, is it a fair statement that the defendant has

5    literally no interest in having settlement discussion, even if

6    it's a nuisance value to just have this case settle?

7            MR. COOPER:  I mean, I can't kind of preemptively

8    say, Your Honor, that if Mr. El-Hag, just speaking

9    hypothetically, came to me tomorrow and said, okay, if

10   Consensys is willing to pay $100, we'll settle the case, I

11   can't tell you right now, Your Honor, that Consensys would say

12   no way, it's walk away or nothing.

13           But I can tell you that Mr. El-Hag has not

14   approached us in recent years about settlement.  We don't know

15   what he means by what the family might consider a reasonable

16   amount.  And I do know that, as of now, I'm only authorized to

17   suggest or propose the -- a walkaway as I did earlier.

18           THE COURT:  I understand.  I do think, though, given

19   the incredibly difficult change of circumstances that the

20   plaintiff is facing in this case that it would make sense for

21   the two of you to try to have a settlement conversation,

22   whether that's privately or, you know, with the Court's

23   support.

24           But before we turn to that, I want to also follow up

25   with one thing with Mr. El-Hag as to the plaintiff's current

1    circumstances.  The docket had indicated, you know, some back

2    and forth with regard to whether or not there needed to be a

3    guardian ad litem appointed on behalf of the plaintiff here.

4    It does sound like his medical situation has changed somewhat

5    over the months that he has been ill.

6                What is happening with him legally?  You said his

7    mother has power of attorney.  Is there anything else that

8    needs to be done to protect his interests and rights,

9    Mr. El-Hag?

10                MR. EL-HAG:  No, Your Honor.  According to his

11   mother, you know, Mr. Sheehan is capable of, you know, having

12   a conversation.

13                And, you know, if something is explained to him, he

14   can process it and make a decision for himself.  But, you

15   know, he's really unable to care for himself, and she had

16   power of attorney for managing his -- you know, his disability

17   payments, things along those lines.  He's living with them.

18                So he can make decisions concerning the case,

19   according to her.  If we would need a doctor to provide an

20   opinion concerning that, you know, I'd -- I'd have to obtain

21   that.  But according to the family, they say that he is

22   capable of making a decision and is cognizant.

23                THE COURT:  Okay.  So, you know, in terms of next

24   steps, obviously, it sounds like discovery isn't really

25   possible here.

1          But at the same time, you know, it's not a great

2     practice to just have a case, you know, kind of lingering with

3     a plaintiff who's not able to fully participate in the

4     litigation, although completely for reasons outside of his

5     control.

6          We understand and want -- you know, obviously want

7     to give him the opportunity to try to recover without

8     prejudicing him with regard to this case.

9          All of that being said, though, it seems to me that

10    the parties really should try to talk about this and figure

11    out if there is anything that the defendant is comfortable

12    with that the plaintiff might be willing to accept in order to

13    let both parties put this matter to rest.

14         So, you know, Mr. El-Hag, do you think that that's

15    realistic for you and Mr. Cooper to try to have a

16    conversation?

17         MR. EL-HAG:  I am -- I'm always willing to have a

18    conversation.  Whether the defendants are, you know,

19    interested in putting out a number that would satisfy the

20    family and would encourage them to walk away is a different

21    story.

22         I am certainly in a position where I would encourage

23    them to really understand the benefit of settling.  And it's

24    not how they wanted this to play out, not how I wanted it to

25    play out, but I would strongly urge them to be extremely

1    flexible in their negotiating position.

2           And, Your Honor, I just -- you know, and I'm

3    brainstorming.  I don't have this fully fleshed out and in

4    front of me right now.

5           But as we're discussing it, I would point out that I

6    think one of the barriers to resolving this case is one of the

7    defendant's defenses, which is they are claiming that they

8    made the decision to terminate Mr. Sheehan prior to them

9    having knowledge of his disability.  And I don't believe that

10   that's correct based on the defendant's contention.

11          So to give some background, it's a disability

12   discrimination claim.  My client had addiction issues.  And he

13   went to the company, and he had expressed the need to go to

14   rehabilitation, and he was fired, you know, almost immediately

15   after that.

16          The defendant -- you know, and when we filed the

17   charge with the Division of Human Rights, they had submitted a

18   position statement, and they outlined a legal argument that

19   says that they had made the decision to terminate Mr. Sheehan

20   for legitimate business reasons prior to him disclosing this

21   issue.  And from our perspective, the termination did happen

22   after he disclosed the issue.

23          And there's case law, not in this circuit but in

24   other circuits, concerning this issue.  And I was thinking

25   that if this case is held up, and we can't resolve the case,

1    that we might be in a position to get an opinion on that

2    defense while we're waiting for Mr. Sheehan to recover.  We

3    could brief that.

4              And I think if we lose that from the plaintiff's

5    side, then we lose the case.  If we prevail on it, then I

6    think that would change the defendant's perspective.  But,

7    obviously, it's -- that's theoretical.

8              And I think Mr. Cooper might be able to elaborate a

9    little bit more on the defense and my -- the idea, but I just

10   wanted to put that out there as something to consider as a way

11   to kind of move the ball.

12             THE COURT:  Well, that is an interesting question,

13   the question of whether or not there are certain facts in the

14   case that could be fleshed out regardless of Mr. Sheehan's

15   ability to participate that could be -- kind of move the case

16   in one way or the other.  So, Mr. Cooper, do you have any

17   thoughts on that?

18             MR. COOPER:  Well, Your Honor, I don't think we

19   would have any interest at all in doing that, frankly.

20             If Mr. Sheehan is unavailable to participate in some

21   of the basic elements of discovery such as sitting for a

22   deposition, I don't know why we would want to jump the gun and

23   start making our summary judgment arguments and putting

24   together our -- what sounds like a mini summary judgment brief

25   in advance of the completion of discovery in a case that might

16

1        never pick up or resume again.

2              And Mr. El-Hag is right.  That is -- the issue

3        that -- to which he alludes -- or the fact to which he alludes

4        is a big sticking point for Consensys that -- I don't want to

5        get too far into the weeds unless you really want to, Your

6        Honor, but that the basics from our standpoint the case is

7        that Mr. Sheehan was hired and started in or about the first

8        week of February 2018.

9              He consistently left work without notice, was

10       unavailable when he was supposed to be available, was

11       completely unproductive and unreliable, was warned about this

12       and the need to improve.

13             His two supervisors scheduled a meeting with

14       Mr. Sheehan to address these very issues and get him -- and

15       put him on notice that he was on, you know, his last leg, so

16       to speak, give him one final chance.  And Mr. Sheehan skipped

17       the meeting without notice.

18             And promptly after that meeting that was supposed to

19       take place but didn't, the two supervisors then went to

20       Consensys management, asked for approval to terminate

21       Mr. Sheehan's employment and received that approval in an

22       email that, of course, is date stamped and time stamped in

23       a -- at a date and time in advance of when Mr. Sheehan alleges

24       that he first disclosed anything that could be considered a

25       disability.

1           So from defendant's standpoint, Your Honor, it's

2      pretty clear here.  And we've shown -- we discussed this way

3      back at the beginning of the litigation with Mr. El-Hag where

4      we pointed out this particular email and the date stamp and

5      the time stamp and where it all fits in within Mr. Sheehan's

6      allegations.  But, you know, we -- I guess we were

7      unpersuasive at that point in time.

8           But to your direct question, Your Honor, I don't

9      think we have any interest, speaking on behalf of defendant,

10     in some sort of, you know, pseudo or mini or preemptive

11     summary judgment briefing in advance of the completion of

12     discovery.

13          THE COURT:  So I don't think that was my question

14     exactly.  It was close but not quite.  My question was, are

15     there factual issues that we can try to resolve?

16          Is there anything we can do in discovery to resolve

17     factual disputes that could move the needle on where this case

18     is going?  And it sounds like your -- the facts as you've

19     proffered them suggest that there were internal employment

20     issues and that the company was already making its internal

21     decisions.

22          And, you know, Mr. El-Hag, do you have a factual

23     dispute with what Mr. Cooper just laid out in terms of the

24     timing of these -- this management meeting and when the

25     supervisors, you know, had sent this email regarding his --

1   the concerns they had about his performance?

2          MR. EL-HAG:  Yeah.  There's a factual dispute, but

3   all of the dispute would come from Mr. Sheehan's testimony.

4   So there are emails, but there's context, you know, behind the

5   scenes to everything that's going on.  And he would have to be

6   the one to set forth the explanation of everything.  So I

7   think --

8          THE COURT:  Okay.

9          MR. EL-HAG:  I don't believe that there's -- if

10  Mr. Sheehan, ultimately -- if it's determined he can't

11  participate, I don't see how this case can go forward.

12         THE COURT:  Okay.  I mean, and that -- it's really

13  the question I had about whether there's a factual dispute is

14  really the dispositive question, because it sounds like it

15  couldn't be decided on summary judgment even if it were to be

16  briefed if there is a fact dispute as to the timing of events,

17  and Mr. Sheehan is one of the only participates or parties

18  that could provide the relevant evidence.

19         You know, are there any other witnesses that could

20  be, from the plaintiff's perspective, you know, deposed or

21  anything else that could occur to help resolve any factual

22  disputes if Mr. Sheehan cannot proceed?

23         MR. EL-HAG:  No.  No, Your Honor.

24         THE COURT:  Okay.  So, you know, I hear you,

25  Mr. Cooper, in terms of why would you compromise the

1   defendant's position; why would you spend any money as

2   Consensys if this plaintiff is incapacitated and cannot go

3   forward.  And the answer to that is simple: nuisance value.

4   Close the case.  Let everybody move on with their lives.

5           So I would encourage the two of you to have a

6   conversation, and a frank one, as to what is really going to

7   happen in this case and when.  Because I am very sympathetic

8   to Mr. Sheehan's position.  It sounds like he suffered a

9   terrible medical tragedy.  But it also sounds that it was

10  truly life-changing and that, you know, these other aspects of

11  his life are going to have -- inevitably be affected.

12          And so, you know, I know you're doing your best,

13  Mr. El-Hag.  I -- this is a tough situation to be in as an

14  attorney.

15          And I understand where you're coming from too,

16  Mr. Cooper.  But at the same time, I do think that continuing

17  to have this case linger indefinitely is not in Consensys'

18  best interest.  There -- your time is not free.  And they

19  should -- you know, I think all the parties should really

20  think hard about what is reasonable to have this case just get

21  resolved.

22          So I would ask that the two of you try to have a

23  conversation and that we set this case down for another status

24  in about 45 days, and we'll see where we're at.

25          Does that sound like a plan to you, Mr. El-Hag?

1          MR. EL-HAG:  Yes, Judge.

2          THE COURT:  Mr. Cooper?

3          MR. COOPER:  Sure thing, Your Honor.

4          THE COURT:  Okay.  So, Ms. Cahn, are you still on

5     the line?  Can we get a date for, I don't know, late August?

6     I know we're booked up, but can we try?

7          THE CLERK:  Sure.  Let me take a look and see what

8     we got.

9          THE COURT:  I think that thing on August 17th might

10    be going away.

11         THE CLERK:  Okay.  If it does, we can do August 17th

12    at 9:30.

13         MR. COOPER:  I'm sorry, Your Honor.  I actually have

14    a -- this is Mr. Cooper.  I have a deposition on that date.

15         THE COURT:  Okay.  Let -- Ms. Cahn, can we find some

16    other date?

17         THE CLERK:  We can do August 19th at 4.

18         MR. EL-HAG:  This is Jordan.  That's good for me.

19         MR. COOPER:  This is Mr. Cooper.  I actually have

20    another deposition in the same case on that day as well.  I

21    would hope that would end before 4 p.m., but I can't say with

22    any certainty, and I don't want to take up the Court's

23    schedule or calendar and have to request an adjournment at the

24    last minute.

25         THE COURT:  I understand, and I appreciate that.

1          THE CLERK:  Let's see.

2          THE COURT:  If the thing is going away on the 17th,

3     it means it's also going away on the 16th.  So do you have a

4     deposition on the 16th as well?

5          MR. COOPER:  Thankfully, Your Honor, I do not.  So I

6     would be happy (indiscernible) for a court appearance on the

7     16th.

8          MR. EL-HAG:  It's fine for me.

9          THE COURT:  Okay.  So what time, Ms. Cahn?

10         THE CLERK:  August 16th at 9:30.

11         THE COURT:  Okay.  That's a date.  And, you know,

12    Mr. Cooper, I fully understand where Consensys is coming from,

13    but this is, obviously, a very highly unusual situation.

14         And, you know, I think that if the parties can have

15    a frank conversation with the mom's involvement, Mr. Sheehan's

16    involvement and just try to really understand kind of, you

17    know, the likelihood that this case can proceed, I do think

18    Mr. El-Hag's comment that the parties are willing -- the

19    plaintiff's willing to be flexible is something that you can

20    work with, you know?

21         So, you know, please do your best to have some

22    conversations, and we will look forward to hearing from you on

23    the 16th as to whether or not there's been any progress.

24         MR. COOPER:  All right.  Thank you, Your Honor.

25         THE COURT:  Okay.  Thank you both.  Have a good

1          afternoon.

2                          MR. EL-HAG:  You too.

3                          MR. COOPER:  You too.  Thank you.

4                          THE COURT:  Take care.

5                  (Proceedings concluded at 3:34 p.m.)

6                          I, CHRISTINE FIORE, Certified Electronic Court

7          Reporter and Transcriber, certify that the foregoing is a

8          correct transcript from the official electronic sound

9          recording of the proceedings in the above-entitled matter.

10

11

12                 *Christine Fiore*

13          _____          October 5, 2021

14              Christine Fiore, CERT

15

16

17

18

19

20

21

22

23

24

25